R. J. KREMER CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
R. J. Kremer Co. v. Commissioner
Docket No. 2738-77.
United States Tax Court
T.C. Memo 1980-69; 1980 Tax Ct. Memo LEXIS 516; 39 T.C.M. (CCH) 1212; T.C.M. (RIA) 80069; March 12, 1980, Filed *516 Held, petitioner did not establish that amounts paid to stockholder-employee in each of the taxable years in issue was reasonable compensation. Held, further, reasonable compensation for each of the taxable years determined. Gene F. Reardon, for the petitioner. Rick K. Budd, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined the following deficiencies in petitioner's corporate income tax: Year
Deficiency
1973
$10,723.42
1974
18,912.00
1975
22,612.82
Due to concessions by petitioner, the only issue for decision is whether payments made by petitioner to *517 Ethelyn Kremer during each of the taxable years in issue in excess of the amounts allowed by respondent constituted reasonable compensation fully deductible by petitioner under section 162(a)(1), I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts were stipulated and they are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. R.J. Kremer Co., Inc. (hereinafter petitioner) was incorporated in 1958 under the laws of the State of Colorado. At the time of the filing of its petition herein, petitioner's principal place of business and principal office were in Denver, Colo. Petitioner was an accrual basis taxpayer and it filed Federal corporate income tax returns on a calendar year basis for each of the taxable years in issue. Beginning at a time prior to 1945, R.J. Kremer (hereinafter R.J.) started a business known as the R.J. Kremer Co., a sole proprietorship which was the predecessor of petitioner. Various business activities, *518 including a fastener business (i.e., the sale of nuts and bolts), were conducted by the sole proprietorship until 1958 and, following its incorporation, were continued by petitioner from 1958 until 1960. In 1960 the decision was made to limit petitioner's business solely to the fastener business. Beginning in 1960, and during the taxable years in issue, petitioner engaged solely in the fastener distribution business. In order to be successful in such business, it was necessary for petitioner to maintain a large inventory of fasteners. On its income tax returns for 1958 through 1975, petitioner reported the following items and amounts: NET
UNAPPROPRIATED
INCOME
RETAINED
YEAR-END
YEAR
SALES
PER BOOKS
EARNINGS
INVENTORY
1958
$ 304,787.55
$ 7,633.12
$ 7,452.37
$ 22,004.38
1959
362,204.90
16,380.27
23,832.64
41,629.07
1960
411,642.35
1 4,055.60
37,888.24
47,741.43
1961
503,491.37
12,928.71
50,951.65
61,215.83
1962
570,450.94
21,223.11
72,174.76 71,619.45
1963
734,543.44
27,065.17
99,424.33
107,877.43
1964
957,708.32
37,146.62
136,570.95
143,842.59
1965 1,147,794.48
42,995.06
179,566.01
155,012.63
1966
1,449,259.60
51,852.34
231,757.27
238,813.95
1967
1,435,721.46 38,862.30
270,619.57
247,461.26
1968
1,596,849.52
44,107.84
314,727.41
270.004,41
1969
1,750,584.03
44,357.43 359,084.84
296,763.90
1970
1,816,668.43
46,009.19
405,094.03
379,520.51
1971
2,049,329.44
51,824.05
456,918.08 445,832.09
1972
2,389,843.28
73,058.60
529,976.68
501,136.62
1973
2,869,971.38
103,912.02
633,888.70
495,065.47
1974
3,737,976.28
158,297.63
792,186.33
625,914.60
1975
3,038,102.13
80,108.88
872,295.21
659,248.03
*519 For the taxable years in issue, petitioner reported the following amounts of taxable income and paid the following amounts of Federal corporate income tax: Taxable income
Taxes
1973
$186,579.48
$ 82,431.91
1974
285,477.93
127,180.30
1975
101,966.02
21,852.14
From the date of its incorporation through 1975, all of petitioner's stock was owned in the following amounts: R.J.--49,998 shares; Ethelyn Kremer (hereinafter Ethelyn)--1 share; and Joel Kremer (hereinafter Joel)--1 share. (R.J., Ethelyn, and Joel will sometimes hereinafter be referred to collectively as the Kremers.) Since its incorporation petitioner has never declared nor paid a dividend. The alleged reason for the nonpayment of a dividend was the need to reinvest earnings in buildings and inventory in order that petitioner's business could expand and become successful. R.J. and Ethelyn are husband and wife, having been married in 1945. Joel is R.J.'s son by a prior marriage. R.J. and Ethelyn have no children. R.J. was petitioner's president during 1973 and its chairman of the board in 1974 and 1975. During all 3 taxable years in issue, Ethelyn was petitioner's secretary-treasurer. *520 Joel was petitioner's vice-president during 1973 and its president during 1974 and 1975. Each of the Kremers has been involved in petitioner's business, or that of its predecessor, for a considerable number of years. The incorporation of petitioner did not change the manner in which the business was operated or the Kremers' involvement therein. R.J. has been involved since the inception of the business prior to 1945. Ethelyn began working in the business following her marriage to R.J. in 1945 and she worked full time in the business until 1973. Joel began working for his father in 1951. Although each of the Kremers had different areas of responsibility throughout the years, all three have contributed to petitioner's business growth and they have shared in making business decisions. Corporate decisions were not made on the basis of stock ownership but rather on the basis of a consensus of opinion among R.J., Ethelyn, and Joel. Ehtelyn had varied and extensive educational and business experience prior to her marriage to R.J. in 1945 and her employment by R.J. Kremer Co. She graduated from college in 1927 and she also completed secretarial and bookkeeping courses at a business *521 college. Thereafter, she was employed by a number of different businesses and she obtained experience in bookkeeping, office management, secretarial skills, accounting, and insurance.In her last job prior to her marriage to R.J., Ethelyn earned $125 per week as an office manager and secretary. From the beginning of her employment with R.J. Kremer Co. in 1945 (as an office manager) and through the years of petitioner's existence, including the taxable years in issue, Ethelyn was involved in many aspects of the business. Her duties included, inter alia: (a) Bookkeeping and payroll preparation; (b) analysis of financial reports; (c) employee training and relations; (d) supplier and customer relations; (e) obtaining bank loans with which to operate the business; and (f) analysis of office and warehouse space requirements for the business and preparing for and effecting moves to larger buildings. In addition to the foregoing, during the taxable years in issue it was also necessary for Ethelyn to read business papers aloud to R.J. due to R.J.'s poor eyesight. As the business increased in size and more employees were hired, Ethelyn's duties became more supervisory in nature. Although *522 many of these duties were shared with R.J. and Joel, Ethelyn performed many of those functions which one could expect any executive in a small, family-owned business to perform. Prior to 1973 Ethelyn worked full time in petitioner's business. During the taxable years in issue, however, during which petitioner was open for business 8 hours per day, Monday-Friday, Ethelyn did not keep regular business hours. [2] She would generally go into petitioner's office only when there was work which needed to be done. For example, during the latter part of 1974 and early 1975 when petitioner was in the process of moving its business, Ethelyn worked many 12-hour days preparing for the move. During other periods she would go into petitioner's office for only a few hours, 2 or 3 days per week. Because of the size to which its business had grown, petitioner was able to hire other employees to perform some of the duties formerly performed by Ethelyn.R.J. and Joel, however, continued to work full time and to maintain regular business hours during the taxable years in issue.
*523 Prior to petitioner's incorporation in 1958, Ethelyn did not receive any salary, although both R.J. and Joel did. During the years 1958 through 1975, petitioner paid compensation to each of the Kremers as follows: YEAR
ETHELYN KREMER
R.J. KREMER
JOEL KREMER
1958
$ 1,300.00
$ 15,391.95
$ 7,640.00
1959
1,300.00
15,050.00
8,735.00
1960
5,200.00
29,550.00
14,950.00
1961
4,100.00
28,400.00 17,100.00
1962
4,100.00
28,400.00
18,600.00
1963
5,600.00
33,400.00
31,600.00
1964
8,100.00
32,400.00
26,900. 00
1965
7,600.00
33,400.00
33,200.00
1966
7,600.00
45,917.50
43,400.00
1967
12,900.00
49,150.00
45,480.00
1968 15,100.00
48,600.00
48,400.00
1969
15,000.00
48,500.00
48,400.00
1970
15,150.00
50,200.00
50,200.00
1971
15,10 0.00
61,000.00
61,000.00
1972
27,600.00
76,000.00
76,000.00
1973
40,100.00
111,750.00
111,750.00
1974
55,230.00
145,950.00
145,950.00
1975
52,650.00
139,750.00
141,350.00
Included in the compensation amounts set forth above were the following bonus amounts for the years 1971-1975: [3]
*524 Year
Ethelyn Kremer
R.J. Kremer
Joel Kremer
1971
$12,500
$35,000
$35,000
1972
25,000
50,000
50,000
1973
37,500
75,000
75,000
1974
52,600
106,000
106,000
1975
50,000
100,000
100,000
During 1973-1975 petitioner employed approximately 55 people. Three of petitioner's highest-paid employees received the following amounts during that period: Highest paid
Highest paid
Highest paid
Year
supervisor
Bookkeeper
secretary
1973
$15,393.00
$16,326.15
1974
17,688.00
19,933.29
1975
20,204.83
23,238.12
$5,888.88
Other than the Kremers, the only employees to receive bonuses were supervisors. During 1973 and 1975 each supervisor received a bonus of 5 percent of his gross salary. Each received 10 percent of his gross salary as a bonus in 1974. The Kremers determined the bonuses to be paid to each of them at the end of each respective year. At that time they would review petitioner's financial position and the type of year petitioner had. Based on this information they would determine the bonuses to be received by each. There was no formula by which the bonuses were determined, rather they generally were based *525 on what petitioner could afford to pay. [4] Because petitioner at times did not have the money to pay the bonuses immediately, the Kremers were given demand notes which were paid in installments during the succeeding years. It was a general understanding of each of the Kremers that a portion of the salary and bonus each received during the taxable years in issue was intended to compensate them for prior years (including those years during which the business had been operated as a sole proprietorship) during which they had been undercompensated or, in the case of Ethelyn for 1945-1957, during which no compensation had been received. Neither petitioner nor the Kremers ever specifically set forth in any form the amounts or years for which *526 the Kremers had been, or were considered to be, undercompensated. Nor were any corporate notes ever given. Similarly, no portion of any salary or bonus paid to the Kremers during any year was identified as representing prior years' compensation. Petitioner had funds with which to pay dividends during the taxable years in issue. [5] An important reason for the nonpayment of dividends was the unequal stock ownership and the fact that R.J. alone would receive almost the entire amount of any dividend distribution. Considering the manner in which R.J. Ethelyn, and Joel shared in the operation of petitioner, it would have caused hard feelings for R.J. alone to enjoy the benefits from the success of the operation by the declaration of a dividend. Although discussed prior to 1976, it was not until after the taxable years in issue that action was taken to change the stock ownership of petitioner. [6]
*527 In the statutory notice of deficiency, respondent determined that only a portion of the compensation paid to Ethelyn in each of the taxable years was reasonable for her services and, accordingly, disallowed petitioner's deduction of the portion considered unreasonable. The following table sets forth the compensation paid by the petitioner and the amounts allowed and disallowed as a deduction: Paid
Allowed
Disallowed
1973
$40,100
$14,050
$26,050
1974
55,230
15,830
39,400
1975
52,650
18,250
34,400
Respondent did not disallow any portion of the deduction for compensation paid to either R.J. or Joel for any of the taxable years in issue. ULTIMATE FINDINGS OF FACT Reasonable compensation for Ethelyn in the taxable years 1973, 1974, and 1975 was $28,000, $28,000, and $26,000, respectively. Petitioner failed to establish the amount by which Ethelyn had been undercompensated in years prior to the taxable years in issue and for which it was intended that she be paid during any of those taxable years. OPINION The sole issue for decision is whether payments, to the extent they exceeded the amounts allowed by respondent, made by petitioner *528 to Ethelyn Kremer in 1973, 1974, and 1975 constituted deductible compensation under section 162(a)(1). During the years 1973, 1974, and 1975, petitioner paid to Ethelyn as salaries and bonuses the amounts of $40,100, $55,230, and $52,650, respectiely, all of which amounts were deducted by petitioner. [7] Respondent allowed as deductions for reasonable compensation the respective amounts of $14,050, $15,830, and $18,250. [8] Deductions for the remaining amounts were disallowed. Section 162(a)(1) allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered" when such allowances are "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." In order to be deductible, compensation must be both reasonable in amount and in fact paid purely for services. Sec. 1.162-7(a), Income Tax Regs.Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1340 (1971), *529 affd. without opinion 496 F. 2d 876 (5th Cir. 1974); Nor-Cal Adjusters v. Commissioner, 503 F. 2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Klamath Medical Service Bureau v. Commissioner, 29 T.C. 339, 347 (1957), affd. 261, F. 2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Bonuses paid to employees, if paid for services and which, when added to salaries, do not exceed a reasonable compensation for services, are also deductible under section 162(a)(1). Sec. 1.162-9, Income Tax Regs.
The question of reasonableness of the compensation is one of fact which must be answered on the basis of all the facts and circumstances in a particular case. Charles Schneider & Co. v. Commissioner, 500 F. 2d 148, 151 (8th Cir. 1974), cert. denied 420 U.S. 908 (1975), affg. a Memorandum Opinion of this Court; Levenson & Klein, inc. v. Commissioner, 67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. 564, 567 (1974), affd. 528 F. 2d 176 (10th Cir. 1975). The *530 factors generally considered relevant in determining the reasonableness of compensation include: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.] Commercial Iron Works v. Commissioner, 166 F. 2d 221, 224 (5th Cir. 1948), affg. a Memorandum Opinion of this Court; Kennedy v. Commissioner, 72 T.C. 793, 801 (1979); Pepsi-Cola Bottling Co. of Salina v. Commissioner,supra at 568. No single factor is determinative. Mayson Mfg. Co. v. Commissioner, supra. *531 Furthermore, the compensation amounts will be closely examined where the payments at issue are those of a closely held corporation to a shareholder. Perlmutter v. Commissioner, 44 T.C. 382, 401-402 (1965), affd. 373 F. 2d 45 (10th Cir. 1967). Respondent's determination is presumed to be correct and petitioner has the burden of proving it otherwise. [9]Botany Worsted Mills v. Commissioner, 278 U.S. 282, 292 (1929); Rule 142(a), Tax Court Rules of Practice and Procedure.
Whether the payments were intended to be compensation purely for services is also a factual *532 question. Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1059 (1972), affd. without opinion 474 F. 2d 1345 (5th Cir. 1973). Regardless of the reasonableness of the total compensation paid, it is a condition precedent to the allowability of a deduction that the payments be solely for services rendered. Electric & Neon, Inc. v. Commissioner, supra at 1340. Factors considered in determining whether payments are purely for services include: (1) The corporation's history of dividend payments; (2) the availability of funds for distribution; (3) a comparison of gross and net income of the corporation in relation to the compensatory amount; and (4) the method used to compute compensation. Miles-Conley Co. v. Commissioner, 173 F. 2d 958 (4th Cir. 1949); Mayson Mfg.Co. v. Commissioner, supra; Klamath Medical Service Bureau v. Commissioner, supra.
It is readily apparent that few of the factors normally given consideration in determining the reasonableness of the compensation or whether it was paid purely for services will be of much assistance in answering those question in this *533 case.Petitioner is a relatively small business owned and operated by the 3 Kremers, all of whom participated jointly in the management and policy decisions that arose in the successful conduct and growth of the business. While it would be helpful to have evidence of what other persons in positions similar to Ethelyn's received as compensation, it is doubtful that any true comparables could be found. The business and income of petitioner grew steadily during the period 1945-1975, and during the shorter period that it was incorporated, 1958-1975, and in valuing Ethelyn's services to the corporation consideration must be given to her knowledge of petitioner's business and its merchandise, its credit policies, its bookkeeping, its employees, and its suppliers and customers. This cannot be fairly measured simply by the number of hours she worked or the motions she went through on a daily basis. The dividend policy of petitioner, or lack thereof, is of little help, except in the overall picture, because practically all of the stock of petitioner was owned by R.J.Of course, we recognize that payment of excess compensation to Ethelyn rather than to R.J. might be an easier way to avoid *534 an accumulated earnings tax problem for petitioner, but the evidence does not support such a conclusion. Petitioner argues that because Ethelyn's services to petitioner were as extensive and valuable as those of R.J. and Joel and because respondent did not challenge the greater compensation paid to either R.J. or Joel in each of the taxable years, it logically follows that the compensation paid to Ethelyn in each of the taxable years was reasonable. Petitioner additionally contends that to the extent the compensation received in any of the taxable years was unreasonable for services rendered in that year, then it was compensation for services rendered in prior years during which Ethelyn was undercompensated.Finally, petitioner argues that there is no evidence to support the contention that any portion of the payments was not intended as compensation. It is respondent's position that petitioner has neither established factually that the compensation received was reasonable in amount nor established that the payments were intended purely for services. As to the latter question, it is respondent's contention that the portion of the compensation paid for which a deduction was disallowed *535 was a disguised dividend intended to compensate R.J. and Ethelyn for their proprietary interest in petitioner. Based on a consideration of all the evidence presented, we are convinced that petitioner carrier its burden and proved incorrect the respondent's determinations of reasonable compensation for Ethelyn for each of the taxable years. We are as equally convinced, however, that petitioner did not establish that the amounts paid to Ethelyn in each of the taxable years was reasonable. It is our conclusion, from the record before us, that reasonable compensation for Ethelyn's services for 1973, 1974, and 1975 was $28,000, $28,000 and $26,000, respectively. Accordingly, petitioner is entitled to section 162(a)(1) deductions in the same amounts. It is generally a difficult taks to draw the line between reasonable and excessive compensation, and this case is not an exception. The evidence presented clearly indicated that Ethelyn was a capable and experienced businesswoman who greatly contributed to the success and growth of petitioner's business. Nonetheless, there were a number of factors which indicate that the compensation paid to Ethelyn in each of the taxable years was *536 excessive, if not also a distribution of petitioner's earnings. The principal factor which weighs against a finding that Ethelyn's compensation was reasonable was the fact that all but approximately $2,600 of the compensation paid was comprised of bonuses which the Kremers determined among themselves at the end of petitioner's taxable year. While neither bonuses paid as a percentage of profits, Laure v. Commissioner, 70 T.C. 1087, 1100 (1978), on appeal (6th Cir. Feb. 27, 1979), and the cases cited therein, nor retroactive determinations of compensation, Klamath Medical Services Bureau v. Commissioner,29 T.C. at 347 are improper, they must be carefully scrutinized. We note that the bonus paid to Ethelyn in each of the years before us was exactly one-half of the bonuses paid to each of J.R. and Joel. The bonuses paid to Ethelyn were not determined by reference to any other formula but rather by what type of year petitioner had and what petitioner could afford to pay to the Kremers while still retaining sufficient funds with which to operate and expand the business. While such fact is not determinative and the ultimate questions still remain *537 whether the amount of compensation was reasonable for the services rendered and whether the payments were intended purely for services, it can hardly be said that such bonuses represented a reasonable attempt by the Kremers to value Ethelyn's services when the primary criterion was what petitioner could afford to pay. This fact and the absence of any arm's-length dealings between Ethelyn and petitioner precludes giving much weight to the compensation paid for purposes of determining reasonable compensation for services rendered. We are told by petitioner that Ethelyn was as equally important to petitioner as were R.J. and Joel and that respondent's acceptance of R.J.'s and Joel's compensations as reasonable logically requires that the lesser amounts paid to Ethelyn also be accepted as reasonable. Although certainly a consideration, we are in no way bound by respondent's acceptance of the compensation paid to R.J. and Joel as a standard against which to measure the compensation received, and services performed, by Ethelyn. The reasonableness of the compensation paid to each of the Kremers must be decided individually, and we have no evidence as to what factors the respondent emphasized *538 in accepting R.J.'s and Joel's compensation as reasonable. Furthermore, if Ethelyn was as valuable and as equally involved in the business, why did she consistently receive less compensation than either R.J. or Joel? Since 1965 R.J. and Joel have received approximately the same compensation, while Ethelyn received only about one-third of their compensation until the years before us. The bald assertion that funds were needed in order to expand petitioner's business does not explain the disparity. If such was the case, why did Ethelyn suffer disproportionately? Petitioner certainly did not introduce any evidence which justified the difference. Based on the consistent disparity in compensation received and in the absence of any satisfactory explanation thereof, it is difficult to consider Ethelyn as valuable as R.J. and Joel when the parties did not treat her as such. During the taxable years in issue, Ethelyn did not keep regular business hours; instead, she worked when the need arose. Many of the duties which Ethelyn formerly performed were being performed by employees whom Ethelyn supervised. Although Ethelyn's part-time services were no doubt valuable, it is difficult to *539 justify an increase of $12,500 in compensation from 1972 to 1973 (and further increases in 1974 and 1975 when compared to 1972) when it appears her work decreased. An increase in the salary of an officer without a corresponding increase in corporate responsibilities, much less an apparent decrease, can be indicative of unreasonableness. Pacific Grains, Inc. v. Commissioner,399 F. 2d 603 (9th Cir. 1968), affg. a Memorandum Opinion of this Court. Finally, although it attempted to do so, petitioner failed to introduce any probative evidence concerning compensation which would ordinarily be paid for like services by like enterprises under like circumstances. Mayson Mfg. Co. v. Commissioner,supra at 119. While we have heretofore recognized the probable difficulty in doing so, this does not help us or petitioner's case. Pepsi-Cola Bottling Co. of Salina v. Commissioner,supra at 569. The two witnesses called by petitioner in an attempt to establish comparable remuneration, Edwin Fieman and Albert Roth, were not too familiar with Ethelyn's duties or activities during the period before us and their testimony was too vague *540 and general to be helpful. Another factor which weighed against the allowance of a deduction for the total amounts paid to Ethelyn is that petitioner has never paid a dividend. The absence of any dividends raises the inference that some of the compensation was a distribution of profits, rather than payments purely for services. Charles Schneider & Co. v. Commissioner,supra at 153. This is especially so considering the fact that yearend bonuses were determined by petitioner's profits and what it could afford to pay. While this inference must be tempered by the fact that petitioner had substantial retained earnings after payment of the bonuses and that amounts were invested to increase petitioner's inventory, nonetheless, the absence of any dividend payment is a factor. Contrary to petitioner's contention, there were sufficient funds during the taxable years in issue with which to pay a dividend. The failure to pay dividends cannot be attributed to the need to maintain funds in order to expand the business because such fact certainly did not preclude large yearend bonuses. Rather, the principal reason for the nonpayment of any dividend was the fact that *541 R.J. owned 49,998 of the 50,000 shares of petitioner's stock outstanding and he would have received almost the total amount of any formally declared dividend. In view of the fact that the Kremers considered themselves to be equally involved in the operation of petitioner, any dividend payment which inured principally to the benefit of R.J. would have surely caused bitterness. This, we believe, was the reason why no dividend was ever formally declared.
Notwithstanding the existence of the factors listed above, we had no trouble concluding that a reasonable compensation for Ethelyn's services was greater than that allowed by respondent. Ethelyn was a capable and experienced businesswoman with a thorough knowledge of petitioner's operations, and she performed those duties which she was required to accomplish.Clearly, for example, her efforts were worth more than the compensation paid by petitioner to its bookkeeper and supervisors. Based on a consideration of all the factors, we conclude that a reasonable compensation for Ethelyn's services during each of the taxable years 1973, 1974, and 1975 was $28,000, $28,000, and $26,000, respectively. The amount of compensation found reasonable *542 for 1975 is less than found reasonable for 1974 in order to reflect the decrease in Ethelyn's work schedule during 1975. Having concluded that only a portion of the payments received by Ethelyn in each of the taxable years was reasonable compensation for services rendered in those years, the question then becomes whether any of the amounts not found reasonable for services in those years was reasonable compensation which was intended to compensate Ethelyn for prior years' services for which she was undercompensated. Petitioner's principal argument in this regard is that it was intended that Ethelyn be compensated for her services during 1945-1957 during which she received no compensation. As a general rule it is clear that a corporation may deduct as reasonable compensation payments made to an employee for both current and undercompensated past services. Lucas v. Ox Fibre Brush Co.,281 U.S. 115 (1930); R.J. Nicoll Co. v. Commissioner,59 T.C. 37 (1972). This general proposition of law is of no help to petitioner, however, based on the record in this *543 case. In order for a corporation to be entitled to a deduction for compensation payments made to an employee for under-compensated past services, it is necessary that the corporation establish both the amount of undercompensation, American Foundry v. Commissioner,59 T.C. 231, 237 (1972), affd. on this issue 536 F. 2d 289 (9th Cir. 1976); and that current payments were intended as compensation for past services. Perlmutter v. Commissioner, 373 F.2d at 48. While the question of the requisite intent is not entirely free from doubt, [10] it is clear that petitioner did not sufficiently establish the amount by which Ethelyn was undercompensated in any year prior to those in issue. Petitioner failed to establish what Ethelyn's services were worth during prior years and, therefore, establish the amount by which she was undercompensated. *544 Furthermore, serious doubt exists as to whether petitioner would be entitled to deduct any amount paid to compensate Ethelyn for services rendered to its sole proprietorship predecessor from 1945 to 1958.Regardless of the fact that the Kremers did not change the manner in which the business was managed following petitioner's incorporation, a different entity was created. As a general rule, the separateness of taxable entities must be recognized. Burnet v. Clark,287 U.S. 410 (1932); Dalton v. Bowers,287 U.S. 404 (1932). In U.S. Asiatic Co. v. Commissioner,30 T.C. 1373 (1958), the Court held that taxpayer-corporation could not take a deduction for amounts paid to its sole shareholder-employee as reimbursement for expenses incurred prior to the taxpayer's incorporation and as salary for the same period. In that case it was stated: there is no warrant whatever for [the taxpayer's] attempt to accrue and deduct, as expenses for carrying on its own business after incorporation, salary to [its shareholder-employee] for preceding periods where he could not possibly have been either an officer or employee of the corporation, *545 and business expenses which had been incurred and paid by [the shareholder-employee] during said preceding periods when he was operating either as a joint venturer or as a sole proprietor. [30 T.C. at 1380.] This conclusion was specifically affirmed in LaMastro v. Commissioner,72 T.C. 377 (1979). See also Bianchi v. Commissioner,66 T.C. 324 (1976), affd. without opinion 553 F. 2d 93 (2d Cir. 1977); and Young v. Commissioner,T.C. Memo. 1979-242. Compare, however, R.J. Nicoll Co. v. Commissioner,supra, in which a deduction was allowed for compensation paid for services rendered to a predecessor entity.[11]
Of course, this would not prevent petitioner from compensating *546 Ethelyn for undercompensated services performed for the corporation between 1958 and 1973. Because of lack of evidence, we cannot attribute any specific amount of Ethelyn's compensation in the years 1973-1975 to prior services, but we have given recognition to the knowledge and experience she gained in those earlier years in determining the reasonable compensation for 1973-1975. In summary, we conclude that reasonable compensation for Ethelyn for the taxable years 1973, 1974, and 1975 was $28,000, $28,000, and $26,000, respectively, and, therefore, petitioner is entitled to a deduction in like amount. [12]
Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue, unless otherwise indicated.↩
2. On petitioner's corporate income tax return for 1973 and 1974 Ethelyn was listed as devoting full time to the business, while for 1975 she was listed as devoting only part time.↩
3. Only general evidence was presented concerning petitioner's payment of bonuses prior to 1971. Bonuses were apparently first received by the Kremers in 1966.↩
4. At petitioner's annual meeting on Dec. 7, 1971, it was decided that Ethelyn would receive an annual salary of $2,650 and an annual bonus equal to one-half of the sum of the bonuses paid to R.J. and Joel provided she devoted her reasonable efforts to the business. This provision was not adhered to during the taxable years in issue. Ethelyn's bonuses during these years approximated one-fourth the sum of the bonuses paid to R.J. and Joel.↩
5. Recorded in the minutes from petitioner's annual meetings for the years 1971-1973 and 1975 were the following estimated increased in the "stockholders' equity" for each of the years: Year
Increase
1971
$35,000
1972
75,000
1973
50,000
1975
50,000
The minutes for the 1974 annual meeting were not introduced. ↩
6. Evidence was not introduced concerning the change in stock ownership.↩
7. Ethelyn's stated base salary was $2,650 at least after 1971; and the evidence indicates that this had been her base salary for some time prior thereto. ↩
8. Nothing in the record suggests how respondent arrived at these figures.↩
9. In the instant case it appears that because Ethelyn was not present on petitioner's premises during the audit of petitioner, the agent of respondent who conducted the audit did not personally question Ethelyn in determining the scope of her duties and a reasonable compensation therefor. The agent relied, however, on R.J.'s and Joel's description of Ethelyn's duties. This fact in no way clouds the presumed correctness of respondent's determination or decreases petitioner's burden of proof. See Good Chevrolet v. Commissioner, T.C. Memo. 1977-291↩.
10. The Kremers testified that a general understanding existed among them that they considered themselves to have been undercompensated for their services during years prior to those in issue (including years prior to petitioner's incorporation) and that they would be compensated for those prior years when petitioner could afford to do so. No portion of the compensation paid to any of the Kremers for any year was identified, however, either at the time such payments were made or for purposes of this proceeding, as representing prior years' compensation. Although it is recognized that closely held corporations such as petitioner are often conducted on an informal basis, see L.R. Schmaus Co. v. Commissioner,406 F. 2d 1044↩ (7th Cir. 1969), revg. a Memorandum Opinion of this Court, the absence of any such identification must be considered in determining whether any of the current payments were intended to compensate for prior services. This is especially so when, in a case such as this, a long period of undercompensation is claimed.
11. R.j. n/icoll Co. v. Commissioner,59 T.C. 37 (1972), was distinguished in both LaMastro v. Commissioner,72 T.C. 377 (1979), and Bianchi v. Commissioner,66 T.C. 324 (1976), affd. without opinion 553 F. 2d 93 (2d Cir. 1977). A footnote to the opinion in Nicoll↩ explains that the Commissioner did not raise this argument in that case.
12. In its petition petitioner prayed that reasonable attorney's fees be awarded pursuant to Pub. L. 94-559, 90 Stat. 2641 (Oct. 19, 1976) amending 42 U.S.C. sec. 1988. This Court has held that it does not have authority to make an allowance of attorney's fees to a petitioner. Key Buick Co. v. Commissioner,68 T.C. 178↩ (1977) (reviewed by the Court), on appeal (5th Cir. Aug. 15, 1977).